**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

JOHN COBB, derivatively on behalf of
TIVITY HEALTH, INC.,

                          Plaintiff,

vs.

KEVIN G. WILLS, SARA J. FINLEY,
ROBERT J. GRECZYN, JR., PETER A.
HUDSON, BETH M. JACOB, BRADLEY
S. KARRO, PAUL H. KECKLEY,
BENJAMIN A. KIRSHNER, LEE A.
SHAPIRO, DAWN M. ZIER, ARCHELLE
GEORGIOU, DANIEL G. TULLY,
DONATO TRAMUTO, and ADAM C.
HOLLAND,

                          Defendants,

and

TIVITY HEALTH, INC.., a Delaware
Corporation,

               Nominal Defendant.

Case No. _____

(Derivative Action)

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff John Cobb ("Plaintiff"), by his attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") on behalf of nominal defendant Tivity Health, Inc. ("Tivity" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers (defined herein as the "Individual Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, and unjust enrichment for misconduct taking place from at least December 2018 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Tivity and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Tivity, the Individual Defendants, and other related non-parties; (c) review of news articles, shareholder communications, and postings on Tivity's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available in the related securities fraud class action captioned *Strougo v. Tivity Health, Inc. et al.*, No. 3:20-cv-00165 (M.D. Tenn.) (the "Securities Action"); and (e) review of other publicly available information concerning Tivity and the Individual Defendants.

## I.  NATURE OF THE ACTION[1]

1.      This shareholder derivative action arises from the Individual Defendants' concealment from investors of the Company's grim financial health resulting from the many integration and operational difficulties suffered by the Company following its acquisition of

---

[1]  All emphasis is added unless stated otherwise.

Nutrisystem, Inc. ("Nutrisystem") in March 2019 (the "Nutrisystem Acquisition") by causing Tivity to issue materially false and misleading statements and omit material information in the Company's SEC filings and other public statements regarding the Company's business, operations, and controls. Specifically, the Individual Defendants caused the Company to issue materially false and/or misleading statements and/or to fail to disclose the following: (i) leading up to and following the Nutrisystem Acquisition, the Individual Defendants repeatedly touted the purported cost benefits and synergies of the Nutrisystem Acquisition and the successful integration of Nutrisystem into the combined company, when in fact, Tivity's Nutrition segment[2] was ailing as it faced significant operational and integration challenges; (ii) the Company's internal controls were not "effective," as the Individual Defendants maintained; (iii) the foregoing would foreseeably have a significant impact on Tivity's business and financials; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

2. Tivity provides fitness and health improvement programs in the United States. Formerly known as Healthways, Inc., the Company changed its name to Tivity Health, Inc. in January 2017. Tivity's shares of common stock trade on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "TVTY."

3. In December 2018, Tivity announced its plans to acquire Nutrisystem, a provider of weight management products and services. The Individual Defendants sold the Nutrisystem Acquisition to investors as a deal with "*[s]ignificant potential for value creation with expected annual cost synergies of ~$30-35 million*." By March 8, 2019, the Nutrisystem Acquisition was completed for approximately $1.3 billion in cash and stock.

---

[2] As used herein, Tivity's "Nutrition segment" refers to the Nutrisystem legacy company within the combined company following the Nutrisystem Acquisition.

4.     After the Nutrisystem Acquisition was complete, almost immediately the Individual Defendants began falsely and repeatedly representing to the market that the Company's *"integration efforts [we]re going well"* and were "*on track*" and that the Nutrisystem Acquisition was "*on track to deliver*" previously expected cost benefits and synergies as an "***integrated portfolio*** of fitness, nutrition and social engagement solutions."

5.     But a little less than a year later, on February 19, 2020, in connection with reporting disappointing financials directly attributable to the Company's Nutrition segment, such that the Individual Defendants could no longer keep up their charade, Tivity was forced to issue a press release (the "February 19, 2020 Press Release") admitting that, in fact, the Company's "***Nutrition segment had a disappointing end to 2019***" and disclosing that the Company's Chief Executive Officer ("CEO"), defendant Donato Tramuto ("Tramuto"), had resigned, effective immediately.

6.     Then, on an earnings call held later the same day, the Company's newly-appointed interim CEO, defendant Robert J. Greczyn, Jr. ("Greczyn"), when discussing the Company's financial results, finally conceded, "***[a]dmittedly, the nutrition business has not worked out as well as planned since the completion of the [Nutrisystem Acquisition] in March 2019***."

7.     Following these disclosures, Tivity's stock price fell $10.43 per share, or 45.49%, to close at $12.50 per share on February 20, 2020, representing an eye-popping loss of ***over $500 million*** in market capitalization in a single day.

8.     Because of the Individual Defendants' gross misconduct, as detailed herein, the Company has been severely damaged, including, but not limited to: (i) being named as a defendant, along with the Company's former CEO, defendant Tramuto, and the Company's Chief Financial Officer ("CFO"), defendant Adam C. Holland ("Holland"), in the Securities Action; (ii) being forced to expend untold litigation defense costs and costs associated with resolving the related

Securities Action; (iii) costs associated with the $1.3 billion Nutrisystem Acquisition and subsequent issues related thereto, including the admitted integration and operational difficulties, which, according to the Company's public filings, are at least $17,052,000.00; (iv) suffering *over $985 million* in market capitalization loss from the height of the Company's share price during the Relevant Period; (v) being forced to incur costs and waste corporate assets in the amount of $8,123,834.00 associated with the wrongful and unjust compensation and other benefits paid to the Individual Defendants who breached, and continue to breach, their fiduciary duties to Tivity; and (vi) suffering irreparable damage to its reputation within the business community and among investors.

9.     Tivity's Board has not, and will not, commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because the directors face a substantial likelihood of liability to Tivity for authorizing and/or failing to correct the false and misleading statements alleged herein and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred, among other reasons discussed herein.  Accordingly, a pre-suit demand on the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate Tivity's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to the Company.

## II.    <u>JURISDICTION AND VENUE</u>

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question and pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over the state

law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Tennessee, or is an individual who has sufficient minimum contacts with Tennessee so as to render the exercise of jurisdiction by the Tennessee courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

13.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

### III.     THE PARTIES

#### A.     Plaintiff

14.     Plaintiff is a current shareholder of Tivity and has continuously held Tivity stock since December 10, 2018. Plaintiff is a citizen of California.

#### B.     Nominal Defendant

15.     Nominal defendant Tivity is a Delaware corporation with its principal executive offices located at 701 Cool Springs Boulevard in Franklin, Tennessee 37067.

#### C.     Individual Defendants

16.     Defendant Kevin G. Wills ("Wills") is Tivity's Chairman of the Board and has been since November 2015. Defendant Wills is also a director and has been since 2012. During the

- 5 -

Relevant Period, defendant Wills paid himself $310,007.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Wills is a citizen of Alabama.

17. Defendant Sara J. Finley ("Finley") is a Tivity director and has been since 2018. Defendant Finley is also a member of the Nominating and Corporate Governance and Strategic Review Committees. During the Relevant Period, defendant Finley paid herself $165,424.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Prior to joining the Tivity Board, defendant Finley served as the Senior Vice President, Assistant General Counsel, and Corporate Secretary of Caremark Rx ("Caremark") from 1998 through 2007. Finley is a citizen of Tennessee.

18. Defendant Greczyn is a Tivity director and has been since 2015. Defendant Greczyn is also Tivity's interim CEO and has been since February 2020; Chair of the Nominating and Corporate Governance Committee; and a member of the Compensation Committee. During the Relevant Period, defendant Greczyn paid himself $215,007.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Greczyn is a citizen of North Carolina.

19. Defendant Peter A. Hudson, M.D. ("Hudson") is a Tivity director and has been since 2016. Defendant Hudson is also a member of Tivity's Audit and Strategic Review Committees. During the Relevant Period, defendant Hudson paid himself $211,447.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Hudson is a citizen of Colorado.

20. Defendant Beth M. Jacob ("Jacob") is a Tivity director and has been since 2018. Defendant Jacob is also a member of Tivity's Audit and Compensation Committees. During the

- 6 -

Relevant Period, defendant Jacob paid herself $171,371.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Jacob is a citizen of Minnesota.

21.     Defendant Bradley S. Karro ("Karro") is a Tivity director and has been since 2014. Defendant Karro is also the Chair of the Compensation Committee and a member of the Strategic Review Committee. During the Relevant Period, defendant Karro paid himself $215,007.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Prior to joining the Tivity Board, defendant Karro also served as the Executive Vice President of Caremark from 1999 until 2006. Karro is a citizen of Tennessee.

22.     Defendant Paul H. Keckley, Ph.D. ("Keckley") is a Tivity director and has been since 2014. Defendant Keckley is also the Chair of the Company's Strategic Review Committee and a member of the Nominating and Corporate Governance Committee. During the Relevant Period, defendant Keckley paid himself $210,840.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Keckley is a citizen of Tennessee.

23.     Defendant Lee A. Shapiro ("Shapiro") is a Tivity director and has been since 2015. Defendant Shapiro is also the Chair of the Company's Audit Committee and is a member of the Compensation Committee. During the Relevant Period, defendant Shapiro paid himself $225,007.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance. Before joining the Tivity Board in 2014, defendant Shapiro served as a director of Physicians Interactive Holdings, LLC ("PIH") from 2009 through 2019, a company founded by defendant Tramuto in 2008. During defendant Shapiro's tenure as a director of PIH, defendant Tramuto also served as the company's CEO. Shapiro is a citizen of Illinois.

24.     Defendant Daniel G. Tully ("Tully") is a Tivity director and has been since August 2019. Tully is a citizen of Colorado.

25.     Defendant Benjamin A. Kirshner ("Kirshner") is a Tivity director and has been since March 2019.  Defendant Kirshner is also a member of the Nominating and Corporate Governance and Strategic Review Committees.  Kirshner is a citizen of Pennsylvania.

26.     Defendant Archelle Georgiou ("Georgiou") is a former Tivity director and former member of the Nominating and Corporate Governance and Strategic Review Committees during the Relevant Period.  During the Relevant Period, defendant Georgiou paid herself $212,924.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance.  Georgiou is a citizen of Minnesota.

27.     Defendant Holland is the Company's CFO and has been since June 2017.  During the Relevant Period, defendant Holland pocketed $805,178.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance.  Defendant Holland is named as a defendant in the Securities Action.  Holland is a citizen of Tennessee.

28.     Defendant Tramuto was the Company's CEO from June 2014 until his resignation on February 19, 2020.  During the Relevant Period, defendant Tramuto pocketed $1,146,622.00 in cash, incentive-based compensation, and other awards not justified by Tivity's actual performance.  Prior to serving as Tivity's CEO, defendant Tramuto founded PIH in 2008 and served as the company's CEO until 2013.  Defendant Tramuto is named as a defendant in the Securities Action.  Tramuto is a citizen of Tennessee.

29.     Defendant Dawn M. Zier ("Zier") is the former President and Chief Operating Officer of Tivity and a former Tivity director from March 2019 until her mutual termination effective December 4, 2019.  Zier is a citizen of New York.

30.     Non-defendant Erin L. Russell ("Russell") is a Tivity director and has been since March 2020.

31.     Non-defendant Anthony M. Sanfilippo ("Sanfilippo") is a Tivity director and has been since March 2020.

32.     Collectively, defendants Wills, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, Kirshner, Shapiro, Tully, Zier, Georgiou, Tramuto, and Holland are referred to herein as the "Individual Defendants," and together with the Company, the "Defendants."

33.     Collectively, defendants Wills, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, Kirshner, Shapiro, and Tully are referred to herein as the "Director Defendants."

34.     Collectively, defendants Hudson, Jacob, and Shapiro are referred to herein as the "Audit Committee Defendants."

35.     Collectively, defendants Finley, Hudson, Karro, and Keckley are referred to herein as the "Strategic Review Committee Defendants."

36.     Collectively, defendants Finley, Greczyn, Keckley, and Kirshner are referred to herein as the "Nominating and Corporate Governance Committee Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background

37.     Tivity provides fitness and health improvement programs in the United States. Formerly known as Healthways, Inc., the Company changed its name to Tivity Health, Inc. in January 2017.

38.     Tivity stock trades on the NASDAQ under the ticker symbol "TVTY."

### B.     The Nutrisystem Acquisition

39.     On December 10, 2018, Tivity issued a press release entitled "Tivity Health to Acquire Nutrisystem for $1.3 billion in Cash and Stock" (the "December 10, 2018 Press Release") announcing the Company's plan to acquire Nutrisystem and touting the purported cost benefits

- 9 -

and synergies the Nutrisystem Acquisition would bring to bear on the Company. Specifically, the

December 10, 2018 Press Release stated, in relevant part:

> - Combination and increased scale will create unique new value proposition for shareholders, health plans, fitness partners, members and consumers – supporting healthier lifestyles and lowering medical costs
> - With the addition of Nutrisystem, Tivity Health will deliver a unique "calories in and calories out" solution
> - ***Expect double digit accretion to Tivity Health's adjusted EPS in 2020 and beyond***
> - ***Significant potential for value creation with expected annual cost synergies of ~$30-35 million***
> - ***New business model with projected substantial cash flow to de-lever the balance Sheet***
>
> NASHVILLE, Tenn. and FORT WASHINGTON, Pa., Dec. 10, 2018 /PRNewswire/ -- Tivity Health, Inc. (Nasdaq: TVTY), a leading provider of fitness and health improvement programs, and Nutrisystem, Inc. (Nasdaq: NTRI), a leading provider of weight management products and services, today announced that they have entered into a definitive agreement under which Tivity Health will acquire all of the outstanding shares of Nutrisystem for a combination of cash and stock. Under the terms of the agreement, which has been unanimously approved by the Boards of Directors of both companies, Nutrisystem shareholders will receive $38.75 per share in cash and 0.2141 Tivity Health shares for each share of Nutrisystem common stock. The transaction values Nutrisystem at an enterprise value of $1.3 billion and an equity value of $1.4 billion, or approximately $47.00 per share. The implied stock consideration of $8.25 per Nutrisystem share is based on the volume-weighted average price of Tivity Health's stock for the 10 days ended December 3, 2018. The implied transaction consideration of $47.00 per share represents a 30% premium based on the volume-weighted average price for Nutrisystem over the last five trading days.

40. From the outset, analysts trusted the Individual Defendants' optimistic characterization of the deal, despite their own reservations. Specifically, on the same day the Nutrisystem Acquisition was announced, December 10, 2018, Oppenheimer issued an analyst report titled, "***Nutrisystem Acq. Raises Questions and Complicates Story, But We're Banking on Mgmt Credibility***." Therein, Oppenheimer analysts noted the many obvious drawbacks of the acquisition, including that it "complicates an otherwise clean story that was focused on senior health and living" and the fact that "increasing debt levels takes out any near-term expectation of

- 10 -

capital return" and "investors are taking the 'sell first and ask questions later' approach as the deal takes away near-term upside in favor of long-term potential." Notably, however, despite these major red flags on the radars of analysts and investors alike, Oppenheimer analysts concluded that "*we believe management's credibility affords them the opportunity to prove their bet will pay off*."

41. Likewise, also on December 10, 2018, Jeffries issued its own report in which it identified several key takeaways about the Nutrisystem Acquisition, including that the Nutrisystem Acquisition "could complicate the simple TVTY model" and "other overhangs," such as "not fully understanding how much of Nutrisystem can be sold into TVTY" and "Nutrisystem's growth slowdown" before determining that the merger would be accretive by 2020.

### C. The Individual Defendants' Materially False and Misleading Statements and Omissions During the Relevant Period

42. Beginning at least as early as March 8, 2019, the Individual Defendants began forcing the Company to issue materially false and misleading statements and omit material information regarding the Company's business, operations, and controls.

43. On that date, Tivity was forced to issue a press release entitled "Tivity Health Completes Acquisition of Nutrisystem" (the "March 8, 2019 Press Release"). The March 8, 2019 Press Release stated, in relevant part:

> NASHVILLE, Tenn., March 8, 2019 /PRNewswire/ -- Tivity Health®, Inc. (Nasdaq: TVTY), a leading provider of fitness and health improvement programs, today announced that it has completed its previously announced acquisition of Nutrisystem, Inc., a leading provider of weight management products and services, for approximately $1.3 billion in cash and stock. With this acquisition, Tivity Health will be unique in offering, at scale, *an integrated portfolio of fitness, nutrition and social engagement solutions* to support overall health and wellness.
>
> **Powerful *Calories In + Calories Out* Combination**
>
> Tivity Health believes this powerful *Calories In+Calories Out* combination will offer a holistic approach to addressing critical health needs, lowering healthcare

- 11 -

costs, and creating additional value for shareholders, health plans, fitness partners, members and consumers. The combined company will have a footprint of more than 75 million members eligible for Tivity Health's SilverSneakers®, Prime® Fitness, WholeHealth Living™ and flip50™ programs and millions of consumers for Nutrisystem's Nutrisystem®, South Beach Diet®, and DNA Body Blueprint™ products, creating multiple opportunities to increase engagement across all brands.

"We welcome Nutrisystem's powerful brands and talented team to the Tivity Health family. Both Nutrisystem and Tivity Health have successful track records improving health, both in the lives of consumers and health plan members, as well as in the communities where we do business. That experience, coupled with our shared commitment to our varied stakeholders, will power successful execution on the many opportunities that lie ahead," said Donato Tramuto, Tivity Health's Chief Executive Officer. "Since announcing the transaction, we have received overwhelmingly supportive feedback from our health plan customers, members and fitness partners about their interest in the broad array of offerings of our combined company. Our integrated approach – which addresses many of the social determinants of health fundamental to wellness – includes fitness, nutrition and social isolation, and represents a powerful offering to support healthier lifestyles, combat chronic conditions and lower medical costs. Tivity Health is now a formidable player in where the market is going – moving away from merely 'sick care' toward fully addressing healthcare."

44.     Such optimism delivered by the Company at the behest of the Individual Defendants assuaged analysts, leading them to issue glowing assessments of the Nutrisystem Acquisition.  For example, just days later on March 11, 2019, Cantor Fitzgerald issued an analyst report, and while the report acknowledged "investor skepticism remains high" and that "[t]he acquisition also adds a significant amount of debt to the [Company's] balance sheet," the firm, like others before it, disregarded these concerns and opined that "the risk/reward trade-off is attractive."

45.     Roughly two months later, on May 8, 2019, Tivity was forced to issue another press release announcing its financial results for the quarter ended March 31, 2019 (the "May 8, 2019 Press Release"), in which the Company was forced to "affirm[] [the Company's] financial guidance for 2019" and falsely announce that the ***Nutrisystem Integration [was] on track***."

46.     In the May 8, 2019 Press Release, Tivity was also forced to state, *inter alia*:

We closed our acquisition of Nutrisystem on March 8, 2019 and ***the Nutrition segment benefited from strong adjusted EBITDA, due to better than expected***

- 12 -

*March program starts and timing of marketing spend. As a result of the successful media and digital strategy in the first quarter*, we plan to leverage Nutrisystem's media and marketing expertise to further increase enrollment and engagement in SilverSneakers and Prime Fitness.

47.     With respect to the Company's Nutrition segment, Tivity was further forced to state

the following in the May 8, 2019 Press Release:

**Segment Results**

\* \* \* \* \*

Nutrition Segment – Revenue was $57.6 million, and Adjusted EBITDA was $13.3 million for the 24-day period March 8, 2019 through March 31, 2019.

"*Our integration efforts are going well and we are on track to deliver the $9 million to $12 million of cost synergies for 2019 previously discussed*," said Adam Holland, Tivity Health's Chief Financial Officer.

48.     The following day, on May 9, 2019, Tivity was forced to file a quarterly report on

Form 10-Q with the SEC, which reported the Company's financial results for the quarter ended

March 31, 2019 (the "Q1 2019 10-Q"). In the Q1 2019 10-Q, among other things, the Company

was forced to report:

On December 9, 2018, we entered into an Agreement and Plan of Merger (the "Merger Agreement") with Nutrisystem, a provider of weight management products and services, and Sweet Acquisition, Inc., a wholly-owned subsidiary of Tivity Health ("Merger Sub"). The Merger Agreement provided that Merger Sub would merge with and into Nutrisystem, with Nutrisystem surviving as a wholly-owned subsidiary of Tivity Health (the "Merger"). The Merger was completed on March 8, 2019 ("Closing"). At Closing, except for certain excluded shares, each share of Nutrisystem common stock outstanding immediately prior to Closing was converted into the right to receive $38.75 in cash, without interest, and 0.2141 of a share of Tivity Health Common Stock ("Exchange Ratio") (with cash payable in lieu of any fractional shares). Nutrisystem shares excluded from the conversion were those shares held by Nutrisystem as treasury stock and shares with respect to which appraisal rights have been properly exercised in accordance with the General Corporation Law of the State of Delaware.

*The acquisition of Nutrisystem enables us to offer, at scale, an integrated portfolio of fitness, nutrition and social engagement solutions to support overall health and wellness and to address weight management, chronic conditions, and social isolation*. The fair value of consideration transferred at Closing was $1.3

- 13 -

billion ("Merger Consideration"), which includes cash consideration, the fair value of the stock consideration, and the fair value of the consideration for Nutrisystem equity awards assumed by Tivity Health that related to precombination services[.]

49.     Attached as an exhibit to the Q1 2019 10-Q was a certification signed by defendants Tramuto and Holland pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting that, *inter alia*, "[t]he information contained in the [Q1 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

50.     Adding salt to the wound, based on the Individual Defendants' misrepresentations, many analysts began to applaud the Company post-acquisition, encouraging investors to continue investing in the Company.  For example, a May 8, 2019 Cantor Fitzgerald analyst report lauded the Company for the fact that "***Nutrisystem [was] Off to a Good Start***" and increased the firm's estimates and price target for the Company.  Likewise, a William Blair analyst report dated May 8, 2019 opined that "***Nutrisystem Integration [was] off to Good Start***" and "[i]n sum, we believe the quarter represented ***a strong start to the year—especially for the nutrition segment***. . . . "  And a May 9, 2019 analyst report from SunTrust Robinson Humphrey similarly opined that Tivity had a "Solid Start To The Year With Some Encouraging Green Shoots," and noting the Company enjoyed "***Solid 1Q Results Across Both Segments***," including the Nutrition segment.

51.     On August 7, 2019, Tivity was forced to file a quarterly report on Form 10-Q with the SEC, reporting in full the Company's financial results for the quarter ended June 30, 2019 (the "Q2 2019 10-Q").  The Q2 2019 10-Q contained substantially identical misrepresentations concerning the Nutrisystem Acquisition to those contained in the Q1 2019 10-Q.

52.     Moreover, attached as an exhibit to the Q2 2019 10-Q was a SOX certification signed by defendants Tramuto and Holland attesting that, *inter alia*, "[t]he information contained

- 14 -

in the [Q2 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.     On November 12, 2019, Tivity was forced to file a quarterly report on Form 10-Q with the SEC, reporting in full the Company's financial results for the quarter ended June 30, 2019 (the "Q3 2019 10-Q").  The Q3 2019 10-Q contained substantially identical misrepresentations concerning the Nutrisystem Acquisition to those contained in the Q1 2019 10-Q and the Q2 2019 10-Q.

54.     Moreover, attached as an exhibit to the Q3 2019 10-Q was a SOX certification signed by defendants Tramuto and Holland attesting that, *inter alia*, "[t]he information contained in the [Q3 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

**D.     The Company's Materially False and Misleading Proxy Statement**

55.     On April 12, 2019, the Individual Defendants also caused Tivity to file a proxy statement for its 2019 annual meeting of stockholders pursuant to Section 14(a) of the Exchange Act (the "Proxy Statement") containing materially false and misleading information and omitting material information regarding the Company's business, operations, and internal controls.

56.     Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claim.

- 15 -

57. In the Proxy Statement, the Individual Defendants solicited stockholder votes to re-elect defendants Finley, Greczyn, Hudson, Jacob, Karro, Keckley, Kirshner, Shapiro, Tramuto, Wills, and Zier to the Board. The Proxy Statement contained materially false and misleading statements and material omissions with respect to this vote. For instance, the Proxy Statement detailed the following concerning "risk oversight" within the Company:

> The Company is exposed to a number of risks, including economic, environmental, operational, and regulatory risks, among others. Management is responsible for the day-to-day management of the risks the Company faces, while the Board as a whole is responsible for the oversight of such risks. Each of the Audit, Compensation, Nominating and Corporate Governance, and Strategic Review Committees plays a significant role in assisting the Board to fulfill its oversight responsibilities.

> Our Audit Committee, for example, is responsible for overseeing the accounting, financial, legal, and regulatory risks the Company faces. The Audit Committee receives reports from management and outside auditors regarding material issues concerning the adequacy of the Company's internal controls over financial reporting. The Audit Committee also has access to management in discharging its duties and provides regular reports to the Board.

> Our Compensation Committee assists the Board with risk oversight by annually reviewing the compensation philosophy of the Company and evaluating and providing recommendations on executive compensation as well as producing an annual report on executive compensation to be included in our Proxy Statement. As further described in "Compensation Discussion and Analysis", the Compensation Committee has determined that our executive compensation program and governance policies do not encourage our management or colleagues to take risks reasonably likely to have a material adverse effect on our business. The Compensation Committee regularly reports its activities to the full Board.

> Our Nominating and Corporate Governance Committee assists with risk oversight by managing Board structure and organization, the criteria for selecting new members to the Board and any Board committees, determining compensation for directors, evaluating Board members, and annually reviewing the corporate governance principles of the Company and recommending changes when appropriate. The Nominating and Corporate Governance Committee regularly provides reports to the Board.

> The Strategic Review Committee assists the Board with risk oversight by reviewing, evaluating, and making recommendations to the Board regarding the Company's business strategy. The activities of each of our committees are set forth in greater detail in each of their respective charters, which are available under

- 16 -

"Corporate Governance" accessible through the "Investors" link on the Company's website at www.tivityhealth.com.

The Company believes that the Board leadership structure supports its role in risk oversight. There is open communication between management and directors, and all directors are actively involved in the risk oversight function.

58.     The statements above were materially false and misleading because they declare that "the Board as a whole is responsible for the oversight of such risks," "including economic, environmental, operational, and regulatory risks, among others." Such major risks would include the operations of the Nutrition segment and the Company's integration efforts related to the Nutrisystem Acquisition, as well as risk from securities laws violations and breaches of fiduciary duties. However, the Board did not exercise any risk oversight when it allowed several of the Company's fiduciaries to make improper statements about the Company's business, operations, and controls and the Nutrisystem Acquisition in various public filings and public statements concerning these subjects.

59.     The misleading statements in the Proxy Statement were the essential link to the directors' reelection.

### E.     The Reasons the Individual Defendants' Statements and Omissions Were Improper

60.     As detailed herein, the foregoing statements were each improper when made because they failed to disclose and/or misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, and/or were reckless in not knowing that:

> (a)     leading up to and following the Nutrisystem Acquisition, the Individual Defendants repeatedly touted the purported cost benefits and synergies of the Nutrisystem Acquisition and the successful integration of Nutrisystem into the combined company, when in fact, Tivity's Nutrition

- 17 -

segment was ailing and not "on track" or "going well," nor did it result in an "integrated portfolio" or offer the combined company any cost benefits or synergies, as it faced significant operational and integration challenges;

(b)     the Company's internal controls were not "effective";

(c)     the foregoing would foreseeably have a significant impact on Tivity's business and financials; and

(d)     as a result, the Company's public statements were materially false and misleading at all relevant times.

**F.     The Truth Emerges**

61.     When the Individual Defendants could no longer maintain the purported success of the Nutrisystem Acquisition, on February 19, 2020, after the market had closed, Tivity was forced to issue a press release announcing the Company's dismal financial results for the fourth quarter and year ended December 31, 2019.  In the February 19, 2020 Press Release, Tivity was finally forced to inform the market that, in fact, its "***Nutrition segment had a disappointing end to 2019***," which included "a non-cash impairment charge of $(377.1) million," contributing to a net loss for the Company of $272.8 million in the fourth quarter.

62.     Also in the February 19, 2020 Press Release, the Company was forced to announce the unexpected resignation of Defendant Tramuto as the Company's CEO, effective immediately.

63.     On an earnings call held later the same day, the Company's newly-appointed interim CEO, defendant Greczyn, discussed the Company's financial results and stated that "***[a]dmittedly, the nutrition business has not worked out as well as planned since the completion of the [Nutrisystem Acquisition] in March 2019***."  Defendant Greczyn further admitted that the Company's Nutrition business unit was "***performing well below its potential***."

- 18 -

64.     On the same earnings call, Defendant Holland also stated, in part:

Turning now to the Q4 results of Nutrition segment. Fourth quarter nutrition revenues came in at $113.7 million, a 12.2% decrease compared to the same quarter last year. ***This decline was primarily driven by a decrease in the DTC business, which includes both the Nutrisystem and South Beach Diet brands.***

Defendant Holland further stated that the Company "recorded a noncash impairment charge of $240 million to lower the carrying amount of the Nutrisystem trade name."

65.     Also on the same earnings call, in response to an analyst's question as to whether the Company's Board had "opened any strategic alternatives for Nutrisystem," defendant Wills, the Chairman of the Board, stated that while the Company "remain[ed] committed to putting [Tivity and Nutrisystem] together," "***we have been disappointed with the Nutrisystem performance. We believe there are a number of reasons for that to include increased competition, some operational missteps, [and] lack of innovation . . . .***"

66.     In response to this news, Tivity (and its shareholders) watched the Company's stock price plunge 83%—from $22.93 per share on February 19, 2020 to close at $12.50 per share on February 20, 2020.

67.     Analysts shared investors' reaction to the Individual Defendants' February 19, 2020 disclosures. For example, in an analyst report issued on February 19, 2020, assessing Tivity's financial health, Credit Suisse commented, "When It Rains, It Pours," specifying that "Challenges in Nutrition Segment Continue as 4Q Misses Expectations."

68.     Despite the optimistic picture painted by the Individual Defendants throughout the Relevant Period, and following the concession that the Nutrisystem Acquisition had not been as successful as touted, many analysts were quick to point out that there were red flags about the Nutrisystem Acquisition almost immediately after its announcement back in December 2018.

- 19 -

69.     For example, an August 8, 2019 analyst report issued by Barrington Research commented, "We think that we largely understand why *investors have been so down on this merger since it was announced eight months ago*. The material balance sheet leverage (over $1 billion) that was taken on to do this deal given the recent disappointing operational results at Nutrisystem . . . made this deal *a bit of a head-scratcher right out of the gate*."

70.     Likewise, a William Blair analyst report dated June 25, 2019 similarly noted that "most investors have put a clear stake in the ground as to where they reside on the deal—*with the transaction being the main culprit that drove the elimination of roughly half of the company's market capitalization over the past six months*."

71.     And on January 7, 2020, Barrington Research issued another analyst note in which the firm noted that "the nutrition business[] was *acquired from Nutrisystem under extreme skepticism a year ago*."

72.     As a result of these wrongful acts and omissions by the Individual Defendants, which caused a significant decline in the market value of Tivity's stock price, the Company and its shareholders have suffered significant losses and damages, as detailed further below.

## V.     DAMAGE TO TIVITY

73.     As a result of the Individual Defendants' gross misconduct, Tivity was forced to disseminate false and misleading public statements containing false and misleading statements and material omissions concerning the Company's business, operations, and controls and the purported success of the Nutrisystem Acquisition throughout the Relevant Period. The Individual Defendants' misconduct has devastated, and continues to devastate, Tivity's credibility, as reflected by the Company's more than *$985 million*, or 80%, market capitalization loss.

- 20 -

74. The Individual Defendants' misconduct has also gravely damaged, and continues to cause damage to, Tivity's reputation within the business community and in the capital markets. In addition to share price, Tivity's current and potential investors generally consider a company's ability to accurately and legally report its financials to be of the utmost importance. However, now, investors and lenders are less likely to provide Tivity with needed capital to finance its future business endeavors, and provided these investors or lenders do so, Tivity's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because of the improper statements and false financial metrics disseminated by the Individual Defendants, which have materially increased the perceived risks of investing in, and lending money to, the Company.

75. Further, as a direct and proximate result of the Individual Defendants' actions, Tivity has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

    (a)    costs incurred from litigating, defending, and resolving the Securities Action alleging violations of federal securities laws;

    (b)    costs associated with the $1.3 billion Nutrisystem Acquisition;

    (c)    additional costs associated with the subsequent issues related to the Nutrisystem Acquisition, including the admitted integration and operational difficulties totaling at least $17,052,000.00 according to the Company's public filings;

    (d)    costs incurred from the dramatic loss in the Company's market capitalization;

- 21 -

(e)    costs incurred from the Company's damage to its reputation within the business community and resultant inability to borrow at favorable rates; and

(f)    costs incurred from wrongful compensation and other benefits paid to the Individual Defendants who breached their duties to Tivity in the amount of $8,123,834.00.

## VI.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

76.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed, and owe, Tivity and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Tivity in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Tivity and not in furtherance of their personal interest or benefit.

77.    To discharge their duties, the officers and directors of Tivity were, and are, required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Tivity were and are required to, among other things:

(a)    establish and monitor a system of effective and sound internal controls, including those concerning the financial reporting process;

(b)    monitor, review, approve, and ensure the accuracy Tivity's financial reports and SEC filings;

(c)     monitor and approve revenue, expense, income, and accrual determinations, including adjustments thereto, implemented in the financial reporting process;

(d)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)     remain informed as to how Tivity conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**B.     Additional Duties of the Board**

78.     Pursuant to Tivity's Board of Directors Corporate Governance Guidelines ("Governance Guidelines"), every member of the Board was, and is, also responsible for certain financial matters, including:

- reviewing and affirming general policies and goals of the Company;
- providing general oversight of the business;
- approving corporate strategy and major management initiatives;
- providing oversight of legal, financial, and ethical conduct;
- electing and, when necessary, replacing the Chief Executive Officer and electing other executive officers of the Company as necessary; and

- 23 -

- • evaluating Board processes and performance.

**C. Audit Committee's Duties**

79. According to its Charter, the Audit Committee's purpose is "to assist the Board in overseeing the accounting and financial reporting processes of the Company and the audits of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the outside auditor's qualifications and independence, and the performance of the outside auditors and of the Company's internal audit function," including, but not limited to:

- • The Committee shall review and discuss with management and the outside auditors the annual audited and quarterly unaudited financial statements, the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operation", and the selection, application and disclosure of critical accounting policies and practices used in such financial statements. The Committee also shall review and discuss with the outside auditors the matters required to be discussed by Statements of Auditing Standards ("SAS") No. 61 and No. 90, as may be modified or supplemented. The discussion of the financial statements and the related critical accounting policies and practices shall occur prior to the public release of such financial statements and the discussion of the related disclosure, including the "Management's Discussion and Analysis of Financial Condition and Results of Operation", shall occur prior to the filing of the Form 10-Q or 10-K. Additionally, based on such review and discussion, the Committee shall consider whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K.

- • The Committee shall review and approve all transactions between the Company and any related person that are required to be disclosed pursuant to Securities and Exchange Commission Regulation S-K, Item 404 ("Item 404"). 'Related person' and 'transaction' shall have the meanings given to such terms in Item 404, as amended from time to time.

- • The Committee shall discuss with management and the outside auditors policies with respect to risk assessment and risk management and the quality and adequacy of the Company's internal controls and processes that could materially affect the Company's financial statements and financial reporting. The

- 24 -

Committee shall meet separately, at least quarterly, with management, and with the outside auditors and shall review with the outside auditors any audit problems or difficulties and management's response.

- The Committee shall: - oversee the work of the outside auditors; - resolve disagreements between management and the outside auditors regarding financial reporting; - discuss with management and the outside auditors the internal audit function in the Company, including its responsibilities, budget and staffing and its planned scope of internal audit; - establish hiring policies for employees or former employees of the outside auditors; - preapprove all auditing services and internal control-related services to be provided by the outside auditors; - preapprove all permitted non-audit services, including tax services, to be provided by the outside auditors, subject to such exceptions as may be determined by the Committee to be appropriate and consistent with federal and regulatory provisions; - receive reports from the outside auditors regarding critical accounting policies and practices, alternative treatments of financial information and generally accepted accounting principles, and such other information as may be required by federal and regulatory provisions; - receive reports from management and legal counsel regarding compliance matters and complaints related to the Company's Code of Conduct; - receive from the outside auditors annually a formal written statement delineating all relationships between the outside auditors and the Company that may impact the objectivity and independence of the outside auditors, including any publicly available portion of any report from the Public Company Accounting Oversight Board ("PCAOB"); and - discuss with the outside auditors in an active dialogue any such disclosed relationships or services and their impact on the outside auditors' objectivity and independence.

- The Committee shall receive reports from the principal executive and financial officers of the Company and the outside auditors regarding any major issues as to the adequacy of the Company's internal controls, any special steps adopted in light of internal control deficiencies and the adequacy of disclosure about changes in internal controls over financial reporting.

- The Committee shall review and discuss with management (including the senior internal audit officer) and the outside auditors the Company's internal controls report and the outside auditor's attestation of the report prior to the filing of the Company's Form 10-K.

- 25 -

- The Committee shall establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls, or auditing matters and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- The Committee shall have the sole authority and responsibility to select (subject, if applicable, to stockholder approval), determine the compensation of, and, where appropriate, terminate and replace the outside auditors, and the outside auditors shall report directly to the Committee.

- To review and approve the decision by the Company to enter into swaps, as defined in Section 1a(47) of the Commodity Exchange Act and applicable regulations and rules ("Swaps").

- To review and approve the decision by the Company to enter into Swaps that are exempt from the requirements of section 2(h)(1) and 2(h)(8) of the Commodity Exchange Act ("Exempt Swaps"), pursuant to section 2(h)(7) of the Commodity Exchange Act and applicable regulations and rules (the "End-User Exception"). The Audit Committee must set appropriate policies governing use of Swaps, Exempt Swaps, and the End-User Exception by the Company]. The Audit Committee must review and approve the decision to use Exempt Swaps, and the policies governing the use of Exempt Swaps, at least annually or more often upon a triggering event, including but not limited to a change in the Company's hedging policy.

**D.     Duties of the Nominating and Corporate Governance Committee**

80.     According to its Charter, the Nominating and Corporate Governance Committee "shall be appointed by the Board to (1) identify and recommend for nomination individuals qualified to become Board members, consistent with the criteria approved by the Board; (2) recommend to the Board members for each Board committee; (3) recommend and oversee the annual evaluation of the Board; (4) review and determine all elements of compensation of the Board and committee chairs and members, including equity-based awards under the Company's compensation plans; (5) review and recommend governance policies and the Business Code of Conduct of the Company; and (6) review annually with the CEO the succession plans of the

- 26 -

Company for executive officers and other selected key executives and the overall succession planning process for the Company."

**E.    Duties of the Strategic Review Committee**

81.    According to its Charter, it is the responsibility of the Strategic Review Committee "to review, evaluate and make recommendations to the Board regarding the ***Company's business strategy***."

**F.    Breaches of Duties**

82.    Each Individual Defendant, by virtue of his or her position as a director and/or officer of Tivity, owes, and owed, to Tivity and its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Tivity, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Tivity, the absence of good faith on their part, and/or a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

83.    In particular, the Individual Defendants breached their duties of loyalty and good faith and violated the law by, *inter alia*: (i) causing Tivity to issue public statements and financial reports with the SEC which contained materially false and misleading information and material omissions related to the Company's business, operations, and controls, and the Nutrisystem Acquisition that misled shareholders into believing that the disclosures were truthful when made; and (ii) failing to implement meaningful internal controls over Tivity's financial reporting process.

- 27 -

## VII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

85.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

86.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including violations of the Exchange Act, breaches of fiduciary duties, corporate waste, and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.     Each of the Individual Defendants aided and abetted, and rendered substantial assistance in, the wrongs complained of herein. In taking such actions to substantially assist the

- 28 -

commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89.    Plaintiff brings this action derivatively in the right, and for the benefit, of Tivity to redress injuries suffered, and to be suffered, by Tivity as a direct result of the violations of the Exchange Act, breaches of fiduciary duty, unjust enrichment, and waste of corporate assets by the Individual Defendants.  Tivity is named as a nominal defendant solely in a derivative capacity.

90.    Plaintiff was a shareholder of Tivity at the time of the wrongdoing complained of herein and has been a shareholder continuously since that time.

91.    Plaintiff will adequately and fairly represent the interests of Tivity in enforcing and prosecuting its rights.

92.     Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand is a futile and wasteful act.

93.    The Board is currently comprised of the following twelve (12) directors: Individual Defendants Wills, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, Kirshner, Shapiro, and Tully and non-defendants Russell and Sanfilippo.  A majority of these directors are not disinterested and independent with respect to the acts and omissions alleged herein.  Notably, at least half of the current Board faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.  Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

- 29 -

**A.    Demand Is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

94.    The Director Defendants—representing ten of the twelve members of the current Board—face a substantial likelihood of liability for their individual misconduct.

95.    The Director Defendants were directors throughout the Relevant Period, and as such, had a fiduciary duty to ensure that the Company's SEC filings, including its annual reports filed on Form 10-K with the SEC and quarterly reports filed on Form 10-Q, Proxy Statement, press releases, and other public statements and presentations on behalf of the Company were accurate, in particular with respect to the Company's business, operations, and controls, and the Nutrisystem Acquisition.  The Director Defendants caused and/or authorized the dissemination of the materially false and misleading statements and material omissions contained in the Company's quarterly and annual SEC filings, Proxy Statement filed with the SEC, press releases, and other public statements.

96.    The statements and omissions detailed herein were improper because, *inter alia*, they misrepresented and/or failed to disclose that: (i) following the Nutrisystem Acquisition, Tivity's Nutrition segment faced significant operational and integration challenges, and was not, in fact, "on track" and "going well," and did not result in an "integrated portfolio," nor did it result in any cost benefits or synergies to the Company, as the Individual Defendants had repeatedly and falsely claimed; (ii) the Company's internal controls were not, in fact, "effective," as the Individual Defendants had claimed; (iii) the foregoing would foreseeably have a significant impact on Tivity's business and financials; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.  As a result, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

97.     In addition, the Director Defendants as directors (and, in some cases, also as members of the Strategic Review Committee) owed, and owe, a duty to exercise good faith and engage in reasonable due diligence and oversight with respect to the review and approval of the Nutrisystem Acquisition.  Indeed, Defendants Wills, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, and Shapiro all, as members of the Board (and in some cases, as members of the Strategic Review Committee), each approved the Nutrisystem Acquisition despite the many red flags broadly observed by investors and analysts alike since the deal was publicly announced.  Indeed, as discussed herein, the multitude of obvious issues attendant to the Nutrisystem Acquisition included, among other things, that the Company's acquisition of Nutrisystem added significant debt to the Company's balance sheet, complicated the Company's otherwise clean focus on senior health, and removed any near-term expectation of capital return for investors.  Rather than fulfill these fiduciary duties, however, defendants Wills, Finley, Greczyn, Hudson, Jacob, Karro, Keckley, and Shapiro knowingly and/or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and approving, or offering recommendations in connection with, the Nutrisystem Acquisition.

98.     Moreover, the Director Defendants as directors (and, in some cases, also as Audit Committee members) owed, and owe, a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused

- 31 -

the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

99.     The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors in the amount of $8,123,834.00.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company were improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

100.    The Director Defendants' making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.

101.    As a result of the foregoing, if the Director Defendants, constituting more than half of the current Board, were to bring a suit on behalf of Tivity to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**B.      Demand Is Futile as to the Audit Committee Defendants**

102.    Demand on defendants Hudson, Jacob, and Shapiro as the Audit Committee Defendants is also futile.  The Audit Committee Defendants were, and are, responsible for, among

- 32 -

other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Tivity's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading press releases and SEC filings, and failed in their specific duties to ensure that the Company's internal controls over its financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants, therefore, is futile on this independent basis.

**C.    Demand Is Futile as to the Nominating and Corporate Governance Committee Defendants**

103.    Demand on defendants Finley, Greczyn, Keckley, and Krishner as the Nominating and Corporate Governance Committee Defendants is also futile by virtue of their roles as members of the Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee Defendants were, and are, responsible for, among other things, "assist[ing the Board] with risk oversight by managing Board structure and organization, . . . determining compensation for directors, evaluating Board members, and annually reviewing the corporate governance principles of the Company and recommending changes when appropriate." In other words, the Nominating and Corporate Governance Committee Defendants were obligated to implement appropriate governance and oversight protections to ensure proper functioning of the Board and compliance with its fiduciary obligations. Despite these duties, however, the Nominating and Corporate Governance Committee Defendants knowingly and/or recklessly

reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing, director compensation and the Company's corporate governance principles, and failed to properly evaluate Board members' performance during the Relevant Period in violation of the Company's Governance Guidelines and Nominating and Corporate Governance Committee Charter. Accordingly, the Nominating and Corporate Governance Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Nominating and Corporate Governance Committee Defendants is therefore futile on this independent basis.

    **D.**  **Demand Is Futile as to the Strategic Review Committee Defendants**

   104.  Demand on the Strategic Review Committee Defendants, which includes defendants Finley, Hudson, Karro, and Keckley, is also futile. The Strategic Review Committee Defendants were, and are, obliged to, among other things, "review, evaluate and make recommendations to the Board regarding the Company's business strategy," which necessarily would include a major acquisition such as the Nutrisystem Acquisition. Despite these duties, however, the Strategic Review Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and approving, or offering recommendations in connection with, the Nutrisystem Acquisition. Accordingly, the Strategic Review Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Strategic Review Committee Defendants, therefore, is futile on this independent basis.

- 34 -

### E. Demand Is Futile as to Defendant Greczyn Because He Is Not Independent

105.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to defendant Greczyn for the additional reason that he is not an independent director.

106.    On February 19, 2020, the Company was forced to announce that defendant Tramuto was resigning as CEO, effective immediately, and that defendant Greczyn would take his place as interim CEO.

107.    Tivity is listed on NASDAQ.  Per NASDAQ listing Rule IM-5605(a)(2), "[a] director *would not* be considered independent while serving as an interim officer."  Indeed, Tivity, by its own admission in the Proxy Statement, applies the definition of independent director provided "under the Nasdaq Stock Market ('Nasdaq') listing standards."

108.    As such, because defendant Greczyn is an employee of Tivity by virtue of his current role as interim CEO, demand is futile as to defendant Greczyn.

### F. Demand Is Futile as to Defendants Finley and Karro Due to Their Close Professional Relationship

109.    Demand is futile as to defendants Finley and Karro for the additional reason that they share a close professional relationship outside their roles as directors of Tivity.

110.    Defendants Finley and Karro's professional relationship dates back to more than *twenty years* ago.  Indeed, defendant Finley served as the Senior Vice President, Assistant General Counsel, and Corporate Secretary of Caremark Rx (previously defined as "Caremark") from 1998 through 2007.  During defendant Finley's roughly nine-year tenure at Caremark, defendant Karro served closely alongside her for approximately *seven years* as the Executive Vice President of Caremark.  Years later, in 2014 and 2018, defendants Karro and Finley, respectively, joined the Tivity Board, where they have continued to work together in the years since.

- 35 -

111.     Due to their longstanding professional and business relationship, defendants Finley and Karro lack independence as to one another, thereby preventing defendants Finley and Karro from taking the necessary and proper action on behalf of the Company as requested herein. Accordingly, demand on defendants Finley and Karro is futile.

### G.     Demand Is Futile as to Defendant Shapiro Due to His Outside Professional Relationship with Defendant Tramuto

112.     Demand is futile as to defendant Shapiro for the additional reason that he and defendant Tramuto share a longstanding professional relationship outside Tivity that renders defendant Shapiro incapable of taking the necessary and proper action on behalf of the Company that Plaintiff seeks herein.

113.     Indeed, defendant Tramuto founded Physicians Interactive Holdings, LLC (previously defined as "PIH") in 2008 and served as its CEO from that date until 2013.  During that time, defendant Shapiro also served as a director of PIH from 2009 through 2019, such that defendant Shapiro worked alongside defendant Tramuto for roughly *four years* prior to becoming a Tivity Board member.  Thereafter, in June 2014, defendant Tramuto became CEO of Tivity, shortly after which, in 2015, defendant Shapiro also joined the Tivity Board, where the pair continued to work closely together for another *four years*, roughly, until defendant Tramuto's resignation in February 2020.  Thus, defendants Tramuto and Shapiro have worked extensively with one another dating back to more than *ten years ago*, rending defendant Shapiro conflicted as to defendant Tramuto and incapable of taking the necessary action on the Company's behalf to right the wrongs perpetrated by the Individual Defendants.

114.     Plaintiff has not made any demand on shareholders of Tivity to institute this action since such demand would be a futile and useless act for the following additional reasons:

- 36 -

(a)    Tivity is a publicly traded company with over millions of shares and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Tivity shareholders; and

(c)    making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, even assuming all shareholders could be individually identified with any degree of certainty.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claim.

117.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, **in contravention of such rules and regulations as the [SEC] may prescribe** as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

- 37 -

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

118.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

119.     The Company's Proxy Statement violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that: (i) following the Nutrisystem Acquisition, Tivity's Nutrition segment faced significant operational and integration challenges and was not "on track" and "going well," and did not result in an "integrated portfolio," nor did it yield any cost benefits or synergies to the Company, as the Individual Defendants repeatedly and falsely claimed; (ii) the Company's internal controls were not "effective"; (iii) the foregoing would foreseeably have a significant impact on Tivity's business and financials; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

120.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the Proxy Statement were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditor.

121.     The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxy Statement.

- 38 -

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Tivity disseminated accurate, truthful, and complete information to its shareholders and maintained adequate internal controls.

124.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's public statements complied with all applicable laws and exercise good faith in carrying out these duties.

125.    The Individual Defendants violated their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Tivity shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures, as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

126.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR UNJUST ENRICHMENT

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tivity.

- 39 -

129.     Plaintiff, as a shareholder and representative of Tivity, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR WASTE OF CORPORATE ASSETS

130.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.     As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in connection with the Nutrisystem Acquisition and the Securities Action, as well as by forcing the Company to pay the improper and unnecessary compensation and other awards and benefits to the Individual Defendants not justified by the Company's actual performance.

132.     As a result of this waste of corporate assets, the Individual Defendants are liable to the Company.

133.     Plaintiff, on behalf of Tivity, has no adequate remedy at law.

### IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Tivity to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company

and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, including, but not limited to:

- a proposal to strengthen the Board's supervision of acquisitions, operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

- a proposal to strengthen the Company's internal reporting controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Tivity's directors, executives, and other employees;

- a proposal to require an independent Chair of the Board and separation of the roles of Chair of the Board and CEO;

- a proposal to permit the shareholders of Tivity to nominate at least three (3) candidates for election to the Board to replace the culpable Individual Defendants currently still sitting on the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C. Awarding to Tivity restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

- 41 -

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## X.    JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  April 9, 2020

**WADE B. COWAN, ATTORNEY AT LAW**

s/ Wade B. Cowan
WADE B. COWAN

P.O. Box 50617
Nashville, Tennessee 37205-0617
Telephone: (615) 352-2331
wcowan@dhhrplc.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, John Cobb, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: 04/08/2020

John Cobb